IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

**LARRY EUGENE REED,**

    **Petitioner,**

v.                             **CRIMINAL ACTION NO. 4:96-cr-22-3**

**UNITED STATES OF AMERICA,**

    **Respondent.**

### *AMENDED MEMORANDUM OPINION AND ORDER*

Before the Court is Petitioner Larry Eugene Reed's ("Petitioner") Motion for Reduction in Sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) ("Motion"). ECF No. 489 ("Mot."). Petitioner filed a Supplemental Motion in Support of a Sentence Reduction ("Supplemental Compassionate Release Motion"). ECF No. 506 ("Pet'r's Suppl. Mot."). The Government responded, and both parties later supplied additional briefing upon Order of the Court. ECF No. 510 ("Resp. Opp'n"); ECF No. 516 ("Suppl. Resp. Opp'n"); ECF No. 517 ("Pet'r's Reply"). The Court finds that the parties' briefs and the original Presentence Investigation Report ("PSR") sufficiently articulate the offense conduct as well as any relevant post-conviction conduct that may be considered in the § 3553(a) factors. Therefore, the Court finds a hearing is unnecessary and this matter is now ripe for judicial determination. For the reasons below, Petitioner's Motion is **GRANTED**.

### I. FACTUAL AND PROCEDURAL HISTORY

On May 10, 1996, Petitioner was named in a superseding indictment alleging his involvement in a "crack" cocaine distribution conspiracy. Supersed. Indictment, ECF No. 11. On September 9, 1996, after a jury trial, Petitioner was found guilty of the following offenses:

- Count 1: Conspiracy to Distribute Marijuana, Cocaine, and 50 grams or more of "Crack" Cocaine, in violation of 21 U.S.C. § 846 and §§ 841(a)(1) and (b)(1)(A) (statutory penalty range of 10 years to life);

- Counts 8 and 9: Distribution or Possession with the Intent to Distribute 50 or more grams of "Crack" Cocaine, in violation of 21 U.S.C. § 841(a)(1) (10 years to life);

- Counts 7 and 12–19: Distribution or Possession with the Intent to Distribute 5 or more grams of "Crack" Cocaine, in violation of 21 U.S.C. § 841(a)(1) (5 to 40 years);

- Counts 10 and 11: Distribution or Possession with the Intent to Distribute Cocaine or "Crack" Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (0 to 20 years);

- Count 20: Use or Carry a Firearm while Trafficking in Illegal Drugs, in violation of 18 U.S.C. § 924(c)(1) (5 years consecutive);

- Count 21: Use or Carry a Firearm while Trafficking in Illegal Drugs, in violation of 18 U.S.C. § 924(c)(1) (20 years consecutive).

The PSR attributed 2.7 kilograms of crack cocaine to Petitioner over the course of the conspiracy. Presentence Investig. Report ¶ 116, ECF No. 491 ("PSR"). On January 17, 1997, this Court sentenced him to the following:

- Count 1: life in prison, followed by 5 years of supervised release;

- Counts 8–9: life in prison, followed by 5 years of supervised release, both to run concurrently with all other counts;

- Counts 7 and 12–19: 480 months in prison, followed by 4 years of supervised release, both to run concurrently with all other counts;

- Counts 10–11: 240 months in prison, followed by 3 years of supervised release, both to run concurrently with all other counts;

2

- Count 20: 60 months in prison, to be served consecutively;

- Count 21: 240 months in prison, to be served consecutively.

J., ECF No. 164. Petitioner has served approximately 27 years in prison. *See* PSR at 1.

According to his Presentence Investigation Report ("PSR"), from January 1984 through April 1996, Petitioner conspired with others to distribute large quantities of marijuana, cocaine, and "crack" cocaine. *Id.* ¶ 6. While never convicted for this offense conduct, on September 25, 1988, Petitioner fatally shot Maxine Menzel while breaking into a residence. *Id.* ¶ 27. While never charged for this offense conduct, on October 15, 1988, Petitioner fatally shot Leroy Lee. *Id.* ¶ 30.

On May 30, 2019, Petitioner filed a Motion for Relief under the First Step Act of 2018 ("First Step Act Motion"). ECF No. 440. On June 5, 2019, the Court received a copy of Petitioner's original presentencing report. ECF No. 443. On September 10, 2019, the Court denied Petitioner's First Step Act Motion. ECF No. 460. Petitioner appealed to the Fourth Circuit. ECF No. 463.

On June 16, 2022, Petitioner filed the instant Motion to Reduce Sentence under 18 U.S.C. § 3582(c)(1)(A)(1). On August 18, 2022, the Court held in abeyance Petitioner's Supplemental Compassionate Release Motion until the Fourth Circuit rendered a decision on his First Step Act Motion. ECF No. 493.

On February 1, 2023, the Fourth Circuit vacated and remanded the Court's judgment denying Petitioner's First Step Act Motion "for the Court to properly calculate Petitioner's Guideline range and to address whether Petitioner's sentence should be reduced to at least the revised statutory maximum." *Reed*, 58 F.4th at 823–24. On February 7, 2023, the Court ordered supplemental briefing. ECF No. 500. On April 10, 2023, Petitioner filed a Supplemental Motion

to Reduce his Sentence Under § 404 of the First Step Act and 18 U.S.C. § 3582(c)(1)(A)(i), and the Government filed a supplemental brief. ECF Nos. 506, 509, 510.

On October 6, 2023, the Court lifted the stay on Petitioner's instant Motion and ordered further briefing. ECF No. 514. On October 17, 2023, the Court granted Petitioner's Supplemental Motion to Reduce his Sentence under § 404 of the First Step Act and reduced his life sentence to a term of 780 months under the following scheme:

- Count 1: 480 months in prison, followed by 5 years of supervised release;

- Counts 8–9: 480 months in prison, followed by 5 years of supervised release, both to run concurrently with all other counts;

- Counts 7 and 12–19: 240 months in prison, followed by 4 years of supervised release, both to run concurrently with all other counts;

- Counts 10–11: 240 months in prison, followed by 3 years of supervised release, both to run concurrently with all other counts;

- Count 20: 60 months in prison, to be served consecutively to Count 1;

- Count 21: 240 months in prison, to be served consecutively to Count 20.

Order, ECF No. 515 ("First Step Act Order"). The Court did not address Petitioner's arguments for compassionate release in the First Step Act Order. *See id.* at 7 n.2. In response to the Court's October 6, 2023 Order, the Government filed a Supplemental Response in Opposition on November 6, 2023 addressing Petitioner's arguments for compassionate release under 18 U.S.C. § 3582(c)(1)(A), and Petitioner replied on November 27, 2023. ECF Nos. 516–17. The Court now addresses the Supplemental Compassionate Release Motion and considers the parties' relevant filings.

## II.   LEGAL STANDARD

### A.   The Threshold Requirement

A petitioner may bring a motion to modify their sentence after they have "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the [petitioner]'s behalf or the lapse of 30 days from the receipt of such a request by the warden of the [petitioner]'s facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). Accordingly, a petitioner seeking compassionate release has two options after requesting that the Bureau of Prisons ("BOP") bring a motion on their behalf: (1) exhaust their administrative remedies; or (2) wait 30 days from the date of their initial request to the BOP. *United States v. Muhammad*, 16 F.4th 126, 131 (4th Cir. 2021) ("[Section] 3582(c)(1)(A) outlines two routes – one of which does not require exhaustion of administrative remedies.").

In other words, a petitioner may satisfy the threshold requirement if they "request[] the Bureau of Prisons to bring a motion on their behalf and *either* fully exhaust[] all administrative rights to appeal the Bureau's decision *or* wait[] 30 days from the date of their initial request to file a motion in the district court." *Id.* Thus, a petitioner who made a request to the BOP at least 30 days prior may seek compassionate release with the district court whether the BOP has ruled on the request or not. *Id.* (holding petitioner satisfied the threshold requirement by filing his compassionate release motion 149 days after submitting a request to the warden, which the warden denied) (citing *United States v. Garrett*, 15 F.4th 335, 338 (5th Cir. 2021); *United States v. Harris*, 973 F.3d 170, 171 (3d Cir. 2020); *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020)). Moreover, the threshold requirement is a non-jurisdictional claim-processing rule, and thus may be waived or forfeited if not timely raised. *Id.* at 129–30 (collecting cases from sister circuits holding the same).

5

**B.      The Compassionate Release Standard**

A court may modify a term of imprisonment after considering the factors set forth in 18 U.S.C. § 3553(a) if "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). The United States Sentencing Commission ("Sentencing Commission") has long defined "extraordinary and compelling reasons" in its policy statement under United States Sentencing Guidelines ("U.S.S.G.") § 1B1.13. In 2018, after the First Step Act amended § 3582(c)(1)(A) to allow defendants to petition the district court directly without clearance from the BOP, U.S.S.G. § 1B1.13 became advisory and nonbinding on courts' application of § 3582(c)(1)(A) because § 1B1.13 was no longer an "applicable" Sentencing Commission policy statement. *See United States v. McCoy*, 981 F.3d 271, 276, 283 (4th Cir. 2020). Courts were thus "empowered to consider *any* extraordinary and compelling reason for release that a defendant might raise." *Id.* at 284 (quoting *United States v. Zullo*, 976 F.3d 228, 230 (2d Cir. 2020)).

The most recent amendments to the Sentencing Guidelines went into effect on November 1, 2023. As amended, U.S.S.G. § 1B1.13 contemplates that a defendant may file a motion for compassionate release directly with the district court. *See* U.S.S.G. § 1B1.13(a) (2023). Therefore, § 1B1.13 is now an "applicable" policy statement under § 3582(c)(1)(A), and the Court must ensure that a sentence reduction granted under § 3582(c)(1)(A) is "consistent with" that Guideline. 18 U.S.C. § 3582(c)(1)(A); *see Brown*, --- F. Supp. 3d ---, 2023 WL 8653179, at *2 (D. Md. Dec. 13, 2023).

Section 1B1.13(b) identifies five broad categories by which defendants may demonstrate extraordinary and compelling reasons to reduce a sentence: (b)(1) medical circumstances; (b)(2) the defendant's age; (b)(3) family circumstances; (b)(4) whether the defendant was a victim of abuse; and (b)(6) whether the defendant received an unusually long sentence. § 1B1.13(b)(1)–(4),

6

(6). Section 1B1.13(b) also includes a catch-all provision allowing courts to find extraordinary and compelling circumstances when "[t]he defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)." § 1B1.13(b)(5). This catch-all provision allows courts to continue exercising discretion and consider "any extraordinary and compelling reason for release that a defendant might raise." *McCoy*, 981 F.3d at 284; *see Brown*, 2023 WL 8653179, at *2 ("This catchall maintains the broad discretion conferred on district courts to consider a wide array of extraordinary and compelling justifications for release."); *United States v. Gaither*, No. 5:19-00012-KDB-DSC-1, 2023 WL 7726622, at *2 (W.D.N.C. Nov. 15, 2023) ("The new policy statement largely preserves the discretion district courts held to consider any extraordinary and compelling reason for release."). Therefore, the Court may consider a combination of factors, including but not limited to those listed in U.S.S.G. § 1B1.13, when evaluating a petitioner's request for a sentence modification under 18 U.S.C. § 3582(c)(1)(A).

### III.   DISCUSSION

Petitioner filed his original Motion for Compassionate Release on June 16, 2022, two years after he filed his first request for compassionate release with the Warden of Federal Correctional Institution Butner II ("FCI Butner II"), the BOP facility that houses Petitioner. Mot. Ex. 2 at 2, ECF No. 489-2. Therefore, Petitioner satisfies the threshold requirement. *See Muhammad*, 16 F.4th at 131. The Court now determines whether extraordinary and compelling circumstances exist and considers the § 3553(a) factors. 18 U.S.C. § 3582(c)(1)(A)(i).

## A.      Extraordinary and Compelling Circumstances

Petitioner argues that extraordinary and compelling circumstances exist for two reasons. First, his sentence is unusually long and grossly disparate from the sentence he would receive today for his conduct. Second, his underlying health conditions and the conditions at FCI Butner II put him at risk of severe illness from COVID-19. The Court examines these arguments in turn.

### i.      Unusually Long Sentence

Prior to the November 2023 Guideline amendments, courts were authorized to consider the length of a petitioner's sentence when determining whether extraordinary and compelling circumstances exist to warrant compassionate release. *See McCoy*, 981 F.3d at 285, 288. Under U.S.S.G. § 1B1.13, a petitioner who has served at least 10 years of his term of imprisonment may demonstrate extraordinary and compelling circumstances by showing he "received an unusually long sentence" and that a "change in the law . . . produce[d] a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed." U.S.S.G. § 1B1.13(b)(6). Petitioner has served 27 years in prison and thus qualifies for consideration under this Guideline.

Petitioner received his original life sentence when he was 28 years old and is now 55 years old. PSR at 2. He is currently sentenced to a total term of imprisonment of 780 months, or 65 years. First Step Act Order. Under Petitioner's current sentence, he will remain in prison until he is at least 79 years old with good time credit, or at most until he is about 93 years old. *See* 18 U.S.C. § 3624.

Petitioner contends his total sentence is unusually long compared to his co-defendants' sentences, the sentences of defendants convicted of murder, and the sentences of defendants without a murder conviction but assigned a cross-reference for first degree murder under the

Guidelines. Pet'r's Reply at 7–11. Petitioner asserts that sentence stacking under § 924(c) before the First Step Act accounts for a 15-year disparity in his sentence compared to what he would receive at the time of his motion, further making his sentence unusually long and grossly disparate because of a change in law. *See id.* at 2–7; U.S.S.G. § 1B1.13(b)(6). The Government argues that the Court already considered disparities between Petitioner's sentence and those of his co-defendants in its First Step Act Order and that the Court should not reduce Petitioner's stacked sentences for his two § 924(c) offenses. Suppl. Resp. Opp'n at 8–10.[1]

Petitioner was convicted of two offenses under 18 U.S.C. § 924(c) which, at the time of his original sentencing in 1997, carried a five-year mandatory minimum for the first offense and a consecutive 20-year mandatory minimum for the second offense "even if the first § 924(c) conviction was obtained in the same case." *McCoy*, 981 F.3d at 275. Under this single-prosecution "sentence stacking" regime ("§ 924(c) stacking"), Petitioner was sentenced to a total of 25-years for his two simultaneous § 924(c) convictions. *See* J., ECF No. 164. A year after sentencing, Congress increased the statutory minimum for each additional § 924(c) conviction from 20 years to 25 years. *See* Pub. L. No. 105-386, 112 Stat. 3469 (Nov. 13, 1998). In 2018, the First Step Act "'amended § 924(c) so that the 25-year mandatory minimum for a second or subsequent offense applies only when a prior conviction under § 924(c) already has become final,' [meaning] 'the 25-year mandatory minimum . . . no longer applies to multiple § 924(c) convictions obtained in a single prosecution.'" *United States v. Brown*, 78 F.4th 122, 130 (4th Cir. 2023) (quoting *United States v. Jordan*, 952 F.3d 160, 171 (4th Cir. 2020)). Therefore, if Petitioner were sentenced at the

---

[1] The Government does not address § 1B1.13 in its briefing, and thus does not precisely contest Petitioner's arguments under § 1B1.13(b)(6). The Government has not asked for an opportunity to further respond to Petitioner's arguments. Considering both parties filed their supplemental briefs after November 1, 2023, and the Guideline Amendments were well publicized before their effective date, the Court does not find it necessary to request further briefing from the Government. *See Adopted Amendments (Effective November 1, 2023)*, U.S. Sentencing Comm'n (May 1, 2023), https://www.ussc.gov/guidelines/amendments/adopted-amendments-effective-november-1-2023 (last visited Feb. 7, 2024).

time of his Motion, he would only receive two consecutive 5-year minimum terms for his two § 924(c) offenses. *See id.*

Before the November 2023 Guidelines amendments, courts "permissibly treated as extraordinary and compelling [circumstances] the severity of defendants' § 924(c) sentences and the extent of the disparity between the defendants' sentences and those provided for under the First Step Act." *Id.* at 126 (citation omitted); *see also McCoy*, 981 F.3d at 285. Under that framework, courts routinely found gross disparities between stacked sentences imposed before the First Step Act and "the sentences Congress now believes to be an appropriate penalty" for § 924(c) violations. *McCoy*, 981 F.3d at 285; *see, e.g., United States v. Johnson*, No. 1:97-cr-314-AJT, 2023 WL 5049267, at *11, n.37 (E.D. Va. Aug. 8, 2023) (finding extraordinary and compelling circumstances where defendant's 65-year sentence on three § 924(c) violations was "four times higher" than the 20 years he would have received if sentenced after the First Step Act). Several courts have found disparities of 10 years or more caused by § 924(c) stacking to create extraordinary and compelling circumstances warranting a sentence reduction. *See, e.g., United States v. Bailey*, 547 F. Supp. 3d 518, 523 (E.D. Va. 2021) (finding a 10-year disparity based on § 924(c) stacking extraordinary and compelling); *United States v. Redd*, 444 F. Supp. 3d 717, 723–24 (E.D. Va. 2020) (finding § 924(c) stacking disparity of 20 years extraordinary and compelling). Recently, in *United States v. Brown*, the Fourth Circuit held that a district court abused its discretion when it refused to reduce a sentence that included two stacked § 924(c) convictions. *Brown*, 78 F.4th at 124. The defendant in *Brown* was originally sentenced to a total of 57 years in prison, including consecutive mandatory minimum sentences of 5 and 25 years for stacked § 924(c) convictions. *Id.* The court held that the additional 20 years attributable to § 924(c) stacking created a "gross disparity" in the defendant's sentence. *Id.* at 131. After considering the

18 U.S.C. § 3553(a) factors, the Fourth Circuit ordered the district court to reduce the defendant's sentence by 20 years. *Id.* at 132–33.

Considering Petitioner's total sentence of 65 years and the 15-year disparity caused by § 924(c) stacking, the Court finds that Petitioner's sentence is unusually long and there is a "'gross disparity' between [Petitioner's] 'sentence and the sentence Congress now believes to be an appropriate penalty for his conduct.'" *Id.* at 131 (quoting *McCoy*, 981 F.3d at 285). Therefore, extraordinary and compelling circumstances exist to warrant a sentence reduction in this case. The Court next addresses additional considerations and Petitioner's arguments about the overall length of his sentence to ensure "full consideration of [Petitioner's] individualized circumstances." U.S.S.G. § 1B1.13(b)(6).

*First*, as stated in the Court's § 3553(a) analysis in the First Step Act Order, the Court recognizes that it has granted sentence reductions to all of Petitioner's co-defendants. First Step Act Order at 17–19. In brief, the Court previously reduced the life sentences of co-defendants Wright, Lee, and Gregory to 360 months, time served of over 300 months, and 400 months, respectively. ECF Nos. 334, 456, 488. The Court granted Mr. Wright and Mr. Lee's reductions upon their motions for relief pursuant to reductions in the Guideline range or statutory maximum sentence available, and it did not consider whether extraordinary and compelling reasons existed under § 3582(c)(1)(A). *See* ECF No. 334 (granting Mr. Wright relief under § 3582(c)(2) for reduced Guideline range under Amendment 750); ECF No. 456 (granting Mr. Lee relief under § 404 of the First Step Act). The Court granted Mr. Gregory a reduction from life to 400 months after finding (1) he was eligible for reduction under § 404 of the First Step Act, (2) the disparity between his life sentence and the total maximum 40-year (480-month) sentence available after the First Step Act created extraordinary and compelling reasons for relief, and (3) the § 3553(a) factors

11

favored a sentence reduction. ECF No. 488 at 9–23, 26–28. In Petitioner's case, the Court has already reduced his sentence based on § 404 of the First Step Act, and it now only considers whether Petitioner meets the standard for relief under § 3582(c)(1)(A). *See* First Step Act Order. The Court repeats that Petitioner's history of murder and violence distinguishes him from his co-defendants, as explained in the Court's First Step Act Order and in the § 3553(a) analysis below. *See* First Step Act Order at 17–19; *see also* ECF No. 488 at 23 ("The Court therefore finds that the seriousness of [Gregory's] conduct falls below Reed, but above Wright and Lee.").

*Second*, recent sentencing data from the United States Sentencing Commission provides additional perspective on the length of Petitioner's sentence. *See, e.g.*, *United States v. Taylor*, No. CCB-02-0410-3, 2023 WL 4407593, at *4 n.7 (D. Md. July 7, 2023). As Petitioner argues, the nationwide average sentence for murder in 2022 was 261 months, and the median sentence was 240 months.[2] Pet'r's Reply at 10. Between 2015 and 2022, defendants assessed with a Guidelines cross reference for first degree murder under U.S.S.G. § 2A1.1 received an average sentence of 295 months and a median sentence of 300 months.[3] Approximately 23.4% of those defendants were sentenced to life in prison, and approximately 19.0% were sentenced between 30 years and less than life.[4]

---

[2] *Statistical Information Packet, Fiscal Year 2022, Fourth Circuit*, U.S. Sentencing Comm'n 11, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2022/4c22.pdf (last visited Jan. 18, 2024) (Table 7: Sentence Length by Type of Crime).

[3] *Interactive Data Analyzer*, U.S. Sentencing Comm'n, https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited Jan. 29, 2024) (reporting Average and Median Sentence Length among "the 1,901 cases reported to the [Sentencing] Commission" by narrowing Data Filters to focus on sentences associated with "Primary Guideline" § 2A1.1 for fiscal years 2015 through 2022). For purposes of calculating these averages, the Sentencing Commission counts sentences of 470 months or greater, including life sentences, as sentences of 470 months. *Id.* This is also true for the Fourth Circuit and Eastern District of Virginia averages derived from the "Interactive Data Analyzer" discussed below.

[4] *Id.* (reporting Distribution of Sentence Length among "the 1,901 cases reported to the [Sentencing] Commission" by narrowing Data Filters to focus on sentences associated with "Primary Guideline" § 2A1.1 for fiscal years 2015 through 2022).

In the Fourth Circuit, the average sentence length for murder in 2022 was 304 months, and the median sentence was 300 months.[5] Pet'r's Reply at 10. Between 2015 and 2022, Fourth Circuit defendants assessed with a cross reference for first degree murder received an average sentence of 338 months and a median sentence of 360 months.[6] Approximately 32.2% of those defendants were sentenced to life in prison, and approximately 21.9% were sentenced between 30 years and less than life.[7] The Court further observes that in the Eastern District of Virginia, the average sentence imposed for murder crimes in 2022 was 362 months, and the median sentence was 470 months.[8] Similarly, defendants in this District assessed with a Guidelines cross reference for first degree murder between 2015 and 2022 received an average sentence of 398 months and a median sentence of 470 months.[9] Approximately 55.6% of those defendants were sentenced to life in prison, and approximately 18.5% were sentenced to between 30 years and less than life.[10]

This recent data demonstrates that Petitioner's 65-year sentence is not a complete anomaly. A majority of defendants in the Eastern District of Virginia and in the Fourth Circuit assessed a first degree murder cross reference were sentenced to more than 30 years in prison. Although this

---

[5] *Statistical Information Packet, Fiscal Year 2022, Fourth Circuit*, U.S. Sentencing Comm'n 11, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2022/4c22.pdf (last visited Jan. 18, 2024) (Table 7: Sentence Length by Type of Crime).

[6] *Interactive Data Analyzer*, U.S. Sentencing Comm'n, https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited Jan. 18, 2024) (reporting Average and Median Sentence Length among "the 311 cases reported to the [Sentencing] Commission" by narrowing Data Filters to focus on sentences associated with "Primary Guideline" § 2A1.1 in the Fourth Circuit for fiscal years 2015 through 2022).

[7] *Id.* (reporting Distribution of Sentence Length among "the 311 cases reported to the [Sentencing] Commission" by narrowing Data Filters to focus on sentences associated with Primary Guideline § 2A1.1 in the Fourth Circuit for fiscal years 2015 through 2022).

[8] *Statistical Information Packet, Fiscal Year 2022, Eastern District of Virginia*, U.S. Sentencing Comm'n 11, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2022/vae22.pdf (last visited Jan. 18, 2024).

[9] *Interactive Data Analyzer*, U.S. Sentencing Comm'n, https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited Jan. 18, 2024) (reporting Average and Median Sentence Length among "the 81 cases reported to the [Sentencing] Commission" by narrowing Data Filters to focus on sentences associated with "Primary Guideline" § 2A1.1 in the Eastern District of Virginia for fiscal years 2015 through 2022).

[10] *Id.* (reporting Distribution of Sentence Length among "the 81 cases reported to the [Sentencing] Commission" by narrowing Data Filters to focus on sentences associated with "Primary Guideline" § 2A1.1 in the Eastern District of Virginia for fiscal years 2015 through 2022).

proportion drops to approximately 42.4% nationwide, that still represents a significant percentage of defendants who recently received above-average sentences where the offense conduct involved first degree murder. Nevertheless, the Court recognizes the need to consider Petitioner's individual circumstances and the weight that the Fourth Circuit and other courts place on the average sentence lengths for murder. *See Brown*, 78 F.4th at 131; *McCoy*, 981 F.3d at 285; *Johnson*, 2023 WL 5049267, at *8.

*Third*, Petitioner highlights cases where the Fourth Circuit found a sentence over 50 years lengthy compared to those charged with murder and subsequently reduced that sentence. *See United States v. Brown*, 78 F.4th 122, 131 (4th Cir. 2023); *McCoy*, 981 F.3d at 285. In *Brown*, the Fourth Circuit found that a 57-year sentence imposed on a thirty-four-year-old defendant was "sheer and unusual" in length where the defendant was not charged with causing physical violence or injury. 78 F.4th at 131. Similarly, in *McCoy*, the Fourth Circuit noted that one group of defendants' 53-year sentences for convictions of bank robbery and use of a firearm in connection with the robberies were "about twice as long as federal sentences imposed today for murder." 981 F.3d at 285. These cases are not entirely applicable to Petitioner's case, however, because neither *Brown* nor *McCoy* involved murder or another killing.

Additionally, in *McCoy*, the effects of § 924(c) stacking accounted for the majority of the sentences imposed in the two underlying cases consolidated for appeal. In *United States v. Bryant*, the defendant's sentence comprised about 8 years for robbery and a mandatory consecutive 45 years for stacked § 924(c) convictions. *United States v. Bryant*, No. 95-202-CCB-3, 2020 WL 2085471, at *1 (D. Md. Apr. 30, 2020), *aff'd sub nom United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020). Section 924(c) stacking added 30 years to what would have been a mandatory 15-year consecutive sentence after the First Step Act. *Id.* at *3. The district court reduced the defendant's

14

sentence to time served on account that he had already served almost 25 years in prison and after finding the 18 U.S.C. § 3553(a) factors favored a reduction. *See id.* at \*2–\*5. In *McCoy v. United States*, the defendant's total sentence of about 35 years contained a mandatory stacked term of 32 years, which would have only amounted to a mandatory 14 years without stacking. *McCoy v. United States*, No. 2:03-cr-197, 2020 WL 2738225, at \*1–\*2 (E.D. Va. May 26, 2020), *aff'd* 981 F.3d 271 (4th Cir. 2020). Upon consideration of the 18 U.S.C. § 3553(a) factors, the district court reduced the defendant's sentence to time served of approximately 17 years. *Id.* at \*6. Unlike *Bryant* and *McCoy*, Petitioner has not yet served the term of imprisonment that applies before his mandatory, consecutive terms for § 924(c) violations. Instead, the majority of Petitioner's 65-year sentence rests on his 40-year term on Counts 1, 8, and 9. Petitioner's request for a reduction to time served would dramatically reduce not only his overall sentence, but his time served on those three Counts alone.

*Fourth*, Petitioner further identifies several cases where courts reduced lengthy sentences of individuals convicted of murder or other killings. *See, e.g.*, *Johnson*, 2023 WL 5049267, at \*1 (reducing life sentence imposed, in part, for Aiding and Abetting Murder in Aid of Racketeering to 35 years); *Taylor*, 2023 WL 4407593, at \*3–\*5 (reducing life sentence to 35 years where defendant convicted of drug conspiracy, witness tampering, and Use of a Firearm in Furtherance of a Drug-Trafficking Crime Resulting in Death would likely have received 30 years if sentenced in 2023). Petitioner also highlights cases where courts reduced lengthy sentences of individuals who were assessed a cross reference for murder. *See, e.g.*, *United States v. Babb*, No. CR ELH-04-0190, 2021 WL 2315459, at \*20 (D. Md. June 4, 2021) (reducing original mandatory life sentence to total sentence of 30 years where amendments to 18 U.S.C. § 851 meant the defendant would only have faced a 15-year mandatory minimum sentence, rather than life); *United States v.*

15

*Keyes*, No. 3:03-cr-8-4, 2022 WL 757958 (W.D. Va. Mar. 11, 2022) (reducing original mandatory life sentence to a total of 280 months and acknowledging that the First Step Act limited the Guideline recommendation to 600 months where first degree murder cross reference was applied).

These cases all turn on highly individualized assessments of the defendants' original sentences, the extraordinary and compelling circumstances present in those cases, and application of the 18 U.S.C. § 3553(a) factors to those specific defendants. As such, the Court finds these examples to be of limited persuasive authority. At a minimum, the Court acknowledges that Petitioner's total 65-year sentence is substantially longer than the reduced sentences imposed in these cases and in cases where § 924(c) stacking was involved, such as *Bryant* and *McCoy*. Therefore, these cases support the conclusion that Petitioner's sentence is unusually long.

*Fifth and finally*, Petitioner argues that he was never charged or convicted with the murders of Maxine Menzel or Leroy Lee. Pet'r's Reply at 9–10. Although Petitioner argues he should not be sentenced using "acquitted" conduct, he was not acquitted of either murder in federal court.[11] *See* Pet'r's Reply at 9, n.3. The superseding indictment alleged he murdered Maxine Menzel in furtherance of the drug conspiracy alleged in Count 1, for which he was found guilty, and a preponderance of the evidence demonstrated that he murdered Leroy Lee in connection with the conspiracy. Supersed. Indictment; Verdict, ECF No. 133; J., ECF No. 164; PSR at 37–45 (explaining the Court overruled Petitioner's objections to PSR regarding sufficiency of evidence for the two murders). On appeal, the Fourth Circuit found "that the record establishes a direct connection between the murders and the conspiracy." *United States v. Gregory*, Nos. 97-4090, 97-

---

[11] This sentence is amended pursuant to the Court's Memorandum Order filed today granting Petitioner's Motion to Correct Final Judgment. *See* ECF No. 519; Fed. R. Civ. P. 60(a). In 1994, Petitioner was charged with the murder of Maxine Menzel in Williamsburg Circuit Court in Williamsburg, Virginia. PSR at 26–27. "At the conclusion of a jury trial on October 6, 1994, [Petitioner] was found not guilty" of those charges. *Id.* at 27. This amendment does not change the substance of the Court's analysis or final judgment reflected in the original Memorandum Opinion and Order field on February 8, 2024. *See* ECF No. 518.

4091, 97-4089, 97-4156, 1998 WL 390176, at *5 (4th Cir. 1998). Therefore, the cross-reference for first degree murder remains appropriate in this case and produces a total offense level of 43 and a Guidelines recommendation of life in prison, albeit capped by First Step Act's statutory maximum of 480 months for his 21 U.S.C. §§ 841 and 846 convictions. U.S.S.G. § 5A Sentencing Table (2023). The Court already reduced Petitioner's term under Counts 1, 8, and 9 to comport with new statutory maximum under the First Step Act but refused to ignore Petitioner's two murders. *See* First Step Act Order at 13–15, 20. For these reasons, the Court still finds it appropriate to consider Petitioner's two murders when considering whether extraordinary and compelling circumstances exist and whether the § 3553(a) factors warrant a sentence reduction.

Overall, the Court finds that extraordinary and compelling circumstances exist because of Petitioner's unusually long sentence and the gross disparity caused by § 924(c) stacking. The Court does not find that other circumstances related to Petitioner's sentence length are extraordinary and compelling on their own, but the Court nevertheless considers them in combination with the § 924(c) stacking disparity. *See* U.S.S.G. § 1B1.13 (contemplating that defendants may present other circumstances "or [a] combination of circumstances that, when considered by themselves or together" with other reasons may constitute extraordinary and compelling circumstances). Pursuant to 18 U.S.C. § 3582(c)(1)(A), the Court next considers Petitioner's argument that he faces extraordinary and compelling circumstances related to COVID-19.

### ii.   Circumstances Related to COVID-19

Petitioner argues that his age, underlying medical conditions, and FCI Butner II's inability to effectively manage his underlying conditions place him at severe risk of illness from the COVID-19 virus, constituting extraordinary and compelling reasons to warrant compassionate release. *See* Pet'r's Reply at 11–16; Pet'r's Suppl. Mot. at 24–28. The Government contends that

fear of contracting COVID-19 where a defendant has access to COVID-19 vaccines does not create extraordinary and compelling circumstances. Suppl. Resp. Opp'n at 4–5. The Government also argues that prison conditions have drastically improved since the beginning of the COVID-19 pandemic regarding prisoner health and safety. *Id.* at 5. Finally, the Government avers that FCI Butner II is not experiencing any current significant outbreak of the virus and is operating as normal. *Id.* at 5–6.

"To establish existence of 'extraordinary and compelling' reasons for compassionate release because of COVID-19, [Petitioner] must show 'both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility.'" *United States v. Smith*, No. 3:15-cr-101, 2021 WL 3641463, at *3 (E.D. Va. Aug. 17, 2020) (quoting *United States v. Feiling*, 453 F. Supp. 3d 832, 840 (E.D. Va. 2020)); *see United States v. White*, 613 F. Supp. 3d 966, 967 n.2 (E.D. Va. 2020). This standard is consistent with U.S.S.G. § 1B1.13, which states that extraordinary and compelling circumstances may exist if:

> (i) the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

> (ii) due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

> (iii) such risk cannot be adequately mitigated in a timely manner.

U.S.S.G. § 1B1.13(b)(1)(D)(i)–(iii). The Federal COVID-19 Public Health Emergency ended on May 11, 2023, meaning Petitioner must show his facility is affected by or at imminent risk of an outbreak of COVID-19.[12] U.S.S.G. § 1B1.13(b)(1)(D)(i). Despite Petitioner's underlying health

---

[12] *End of the Federal COVID-19 Public Health Emergency (PHE) Declaration*, Ctrs. for Disease Control & Prevention (Sept. 12, 2023), https://www.cdc.gov/coronavirus/2019-ncov/your-health/end-of-phe.html.

conditions, he does not satisfy the standard necessary to demonstrate extraordinary and compelling circumstances arising from COVID-19.

a.    Particularized Susceptibility to COVID-19

Petitioner argues that he is 54 years old and suffers from high blood pressure, hypertensive heart disease with left ventricle hypertrophy ("LVH"), type II diabetes or prediabetes, hyperlipidemia, obesity, and hypertension. Pet'r's Suppl. Mot. at 24; Pet'r's Reply at 12. The Centers for Disease Control and Prevention ("CDC") indicates that all these conditions, except for hyperlipidemia, can place an individual at increased risk of severe illness from COVID-19.[13] Petitioner also claims he suffers from low back pain, hearing loss, and heart palpitations, but the CDC does not indicate that these conditions place one at greater risk of COVID-19, and Petitioner receives sufficient, regular treatment for these issues. Mot. at 24–25; *see, e.g.*, Pet'r's Suppl. Mot. Ex. 9 at 2–5 (documenting heart palpitations, general "Occupational Risk" for hearing, and lumbar pain and prescribing ibuprofen as of February 2023).

Petitioner takes several medications for his high blood pressure but avers that he continues to have episodes where his blood pressure is elevated, which requires periodic medication adjustments. Pet'r's Suppl. Mot. at 24; *see, e.g.*, Pet'r's Suppl. Mot. Ex. 9 at 14, 17–18, 40, 100, ECF No. 513.[14] Petitioner claims his hypertension has caused damage to his heart, including "hypertensive heart disease with mild concentric LVH and mild left atrial enlargement." Pet'r's Suppl. Mot. at 24; Mot. Ex. 3 at 2–3, ECF No. 489-3. Petitioner claims he has had Type II diabetes since 2019 and that his A1C levels have remained in prediabetes range since then. Pet'r's Suppl. Mot. at 24. Petitioner demonstrates that his Body Mass Index ("BMI") meets the CDC's definition

---

[13] *See People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (May 11, 2023), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.
[14] The Court employs the pagination implemented by the ECF filing system.

of "obesity," which is "30 kg/m² or higher."[15] Pet'r's Suppl. Mot. Ex. 9 at 2 (showing BMI of 30.5 kg/m²). Petitioner further demonstrates that he tested positive for COVID-19 in February 2021, and he claims that he suffers from fatigue caused by "long-haul" COVID-19. Mot. at 24–25.

Petitioner's vaccination status and prior history of COVID-19 infection weigh against his claim that he is particularly susceptible to severe illness from the virus. Petitioner is fully vaccinated against the virus and received a booster shot in November 2021. Pet'r's Suppl. Ex. 9-1 at 81–82, ECF No. 513-1. Petitioner complains that he requested a second booster shot in March 2022 but never received one. Mot. Ex. 8 at 10. Nevertheless, Petitioner's prior vaccinations mitigate his risk of contracting the virus and suffering severe health effects if infected. *See Smith*, 2021 WL 3641463, at *3.[16] Additionally, the fact that Petitioner contracted and recovered from COVID-19 prior to vaccination further shows his limited risk of severe illness from the virus. *See United States v. Drayton*, No. 1:09-cr-76-2, 2021 WL 4267306, at *8 (E.D. Va. Sept. 20, 2021) (finding the defendant's hypertension and obesity "only suggests a particularized susceptibility . . . and only if Defendant's vaccination and apparent full recovery from COVID-19 are ignored"); *United States v. Jones*, No. 3:13-cr-13, 2021 WL 3082113, at *2 (E.D. Va. July 20, 2021) ("[T]he fact that a defendant has established a higher susceptibility to COVID-19 does not resolve the particularized susceptibility requirement . . . [Defendant] has contracted COVID-19, recovered from it, and has now been fully vaccinated so the risk from COVID-19 must be considered slight."). Additionally, although some medical records indicate that Petitioner suffered lasting fatigue possibly caused by "long-haul" COVID-19, *see, e.g.,* Pet'r's Suppl. Mot. Ex. 9 at 83–85,

---

[15] *People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (May 11, 2023), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.
[16] *See also Benefits of Getting A COVID-19 Vaccine*, Ctrs. for Disease Control & Prevention (Sept. 22, 2023), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/vaccine-benefits.html.

88–89, 100–02, that fatigue appears to be "Resolved" as of February 2023. *Id.* at 4, 44; Pet'r's Suppl. Mot. Ex. 9-1 at 23.

Petitioner does not demonstrate that his underlying health conditions are not sufficiently treated at FCI Butner II. As of December 2010, Petitioner has been classified as a "Care Level []1" inmate, meaning he is "Healthy or [needs] Simple Chronic Care," without any change in that status noted in his medical record. Pet'r's Suppl. Mot. Ex. 7 at 1, ECF No. 506-7; *see* Mot. Ex. 4 at 2 (noting Care Level 1 as of December 2021). Petitioner has received consistent treatment and care since entering prison, including in recent years before, during, and after the COVID-19 pandemic. *See generally* Pet'r's Suppl. Mot. Exs. 9, 9-1. The fact that he may need new medications or adjustments to existing medication does not indicate FCI Butner II is unable to care for him. The evidence shows Petitioner's medical conditions are "chronic conditions that can be managed in prison[, which] are not a sufficient basis for compassionate release." *Smith*, 2021 WL 3641463, at *3 (quoting *United States v. Ayon-Nunez*, No. 1:16-cr-130, 2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020)).

For these reasons, Petitioner does not show that he is particularly susceptible to severe illness from COVID-19.

      b.     Particularized Risk of Contracting COVID-19 at FCI Butner II

Even if Petitioner's medical conditions make him particularly susceptible to severe illness from COVID-19, he does not demonstrate a particularized risk of contracting the virus at FCI Butner II.[17] Petitioner argues that FCI Butner II's history of widespread COVID-19 infections and death demonstrate that the facility presents a particularized risk to his health. Pet'r's Reply at 14.

---

[17] Petitioner also argues that other conditions of confinement at FCI Butner II magnify his health risks, including reported issues with black mold. Pet'r's Reply at 14 n.11. Petitioner submits no evidence that the black mold causes him health issues or contributes to his risk of contracting COVID-19, and it therefore does not establish extraordinary and compelling circumstances.

Petitioner submits that, as of April 2023, over 1,170 inmates at FCI Butner II tested positive for COVID-19 and 39 inmates died from the virus. Mot. at 26. Petitioner also points to a January 2021 report by the Department of Justice documenting challenges and deficiencies in FCI Butner II's responses to the COVID-19 pandemic. Mot. Ex. 10.[18]

To determine whether Petitioner faces a particularized risk of severe illness from COVID-19 at his facility, the Court looks to current data and whether there is an "ongoing outbreak of infectious disease" or an imminent risk of one. U.S.S.G. § 1B1.13(b)(1)(D)(i). There are just 16 open cases of COVID-19 within Federal Correctional Complex Butner ("FCC Butner"), which includes FCI Butner II and three other facilities.[19] Approximately 2,700 inmates out of FCC Butner's population of approximately 4,050 have been fully vaccinated against the virus.[20] The Government avers, and Petitioner does not dispute, that FCC Butner is operating at Operational Level 1, which means it has a "[m]edical isolation rate of [less than] 2%" and a "[c]ommunity transmission rate less than 50 per 100,000 over the last 7 days."[21] Suppl. Resp. Opp'n at 5. Therefore, Petitioner shows no "evidence of an actual outbreak ... [but] simply the mere possibility of COVID-19 spreading to his camp" or within his camp. *United States v. Little*, No. 1:10-cr-135, 2020 WL 3442173, at *2 (E.D. Va. June 23, 2020); *see United States v. Woolridge*, No. 3:09-cr-156, 2021 WL 415131, at *5 (E.D. Va. Feb. 5, 2021) (finding no particularized risk of contracting COVID-19 where petitioner's facility had "just under a dozen active cases of COVID-19"). The fact that FCC Butner may have had significant issues controlling the spread of COVID-19 in 2020 and 2021 does not demonstrate Petitioner is at "imminent risk of being affected

---

[18] *See also* Dep't Just., Pandemic Response Report 21-031: Remote Inspection of Federal Correctional Complex Butner (Jan. 2021), https://www.oversight.gov/sites/default/files/oig-reports/DOJ/21-031.pdf.
[19] *Inmate COVID-19 Data*, Fed. Bureau Prisons (Feb. 6, 2024),
https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp.
[20] *Id.*
[21] Fed. Bureau Prisons, COVID-19 Modified Operations Matrix 3 (Feb. 4, 2022), https://www.bop.gov/foia/docs/covid19_modified_ops_matrix_attachment2_v3_02_04_2022.pdf.

by . . . an ongoing outbreak" of COVID-19. U.S.S.G. § 1B1.13(b)(1)(D)(i); *see* Mot. Ex. 10.

Further, Petitioner does not demonstrate how his plan for release would make him any safer from COVID-19. Petitioner avers that if released, he would live with his elderly mother and disabled brother in James City County, Virginia, and seek employment at an AT&T store. Pet'r's Reply Ex. 3, ECF No. 517-3. Petitioner does not explain how living in his mother's home or working in public would reduce his risk of a COVID-19 infection. *See United States v. Watson*, No. 1:07-cr-396, 2020 WL 7318269, at *2 (E.D. Va. Dec. 11, 2020) ("Defendant's release would not necessarily be any safer for him because he would be released to a home that does not follow the strict procedures laid out in the BOP's modified operations plan and he would be living in a county with a significant number of positive COVID-19 cases."). According to the Virginia Department of Health, the Peninsula health region—which includes James City County—recorded over 2,700 COVID-19 diagnoses between November 2023 and January 2024, whereas FCC Butner has experienced an all-time total of 2,332 COVID-19 cases.[22] Petitioner thus fails to explain how his release would mitigate the risk from COVID-19 he currently faces at FCI Butner II. *See Feiling*, 453 F. Supp. 3d at 842; *Woolridge*, 2021 WL 415131, at *6.

For these reasons, Petitioner does not demonstrate he faces a particularized risk of severe illness from COVID-19 because of his incarceration at FCI Butner II.

---

[22] *Emergency Visits for COVID-19*, Va. Dep't Health (last visited Jan. 26, 2024), https://www.vdh.virginia.gov/coronavirus/see-the-numbers/covid-19-data-insights/covid-like-illness-visits/ (reporting the "Number of [Emergency Department] and [Urgent Care] Visits Diagnosed with COVID-19 in [the Peninsula "Health Region"] for the Past 3 Months"); *Virginia Health Regions, [Health] Districts and Localities and Independent Cities* , Va. Dep't Health (last visited Jan. 26, 2024), https://www.vdh.virginia.g ov/content/uploads/sites/20/2022/03/VIRGINIA-HEALTH-REGIONS.pdf (identifying counties within each health region); *Inmate COVID-19 Data*, Fed. Bureau Prisons (Jan. 25, 2024) https://www.bop.gov/about/st atistics/statistics_inmate_covid19.jsp.

### iii.    Disposition regarding Extraordinary and Compelling Circumstances

For the foregoing reasons, the Court finds that extraordinary and compelling circumstances exist to warrant a sentence reduction because § 924(c) stacking added 15 years to his term of imprisonment that he would not face if sentenced at the time of his Motion. The Court does not find that Petitioner's age, underlying health conditions, or risk of serious illness from COVID-19 present extraordinary and compelling circumstances on their own. Nevertheless, the Court considers those health-related circumstances in evaluating the 18 U.S.C. § 3553(a) factors and determining the extent to which a sentence reduction is warranted.

### B.    18 U.S.C. § 3553(a) Factors

As stated in the First Step Act Order, the nature and circumstances of Petitioner's offense are indisputably serious. *See* 18 U.S.C. § 3553(a)(1); First Step Act Order at 15–16. Petitioner was convicted of participating in a twelve-year conspiracy to Distribute and Possess with Intent to Distribute cocaine base, cocaine, and marijuana. PSR ¶ 6. According to the PSR, Petitioner was involved from October 1986 until he was arrested in April 1996. *Id.* ¶ 115. He was considered a supervisor in the conspiracy because he recruited people to distribute cocaine and forced his girlfriend to transport him while he distributed drugs. *Id.* Petitioner was attributed with 2.7 kilograms of crack cocaine. *Id.* ¶ 116. As explained above, Petitioner also killed two people by shooting them in the back of the head multiple times each. *Id.* ¶¶ 27, 30. In one instance, he murdered Maxine Menzel while breaking into a home to steal firearms and money. *Id.* ¶ 27. In the other, Petitioner killed Leroy Lee to resolve a drug debt. *Id.* ¶¶ 29–30. The PSR explains other instances of Petitioner's violent behavior, including firing a gun at the ground during an argument over cocaine quality and causing a ricochet bullet to hit Deno Canady, shooting two other individuals, and offering his services as a "hit man" while admitting he had previously killed a

person. *Id.* ¶¶ 24, 38, 80, 115. In general, the severity of the offense conduct weighs against granting a reduced sentence.

The Court understands the need to avoid unwarranted sentencing disparities in this case. *See* 18 U.S.C. § 3553(a)(6). As discussed above, the Court recognizes that all of Petitioner's co-defendants have received reduced sentences. The Court again finds that Petitioner's history of murder and violence distinguishes him from his co-defendants. *See* First Step Act Order at 18–19. None of Petitioner's co-defendants killed anyone, but Petitioner murdered two people, shot two more, and offered to kill others. PSR ¶¶ 24, 27, 30, 38, 80, 115. Before sentencing, Petitioner had a significant criminal history including several convictions for assault and battery. *Id.* ¶¶ 122–25. Petitioner's role as a supervisor of the drug conspiracy in this case is also significant. *See id.* ¶ 115.

The Court recognizes that Petitioner's sentence is longer than average for individuals convicted of murder or otherwise assigned a cross-reference for first degree murder. *See* Pet'r's Suppl. Mot. at 22–23; Pet'r's Reply at 7–11. Yet it is not uncommon for courts in this District and the Fourth Circuit to sentence defendants in those categories to more than 30 years in prison, as discussed in depth above under the "extraordinary and compelling circumstances" analysis. Considering the recent statistics discussed above and the sentences of Petitioner's co-defendants, the Court finds that the need to avoid unwarranted disparities weighs in favor of a sentence reduction, but not necessarily one that reduces Petitioner's total sentence to 30 years or less.

Petitioner argues that his relative youth at the time of the offense weighs in favor of a reduced sentence. Petitioner was about 16 years old when he became involved in the conspiracy for which he was charged, and he was around 20 years old when he killed Ms. Menzel and Mr. Lee. Pet'r's Reply at 17; PSR ¶¶ 30, 115, 142. As Petitioner notes, the Supreme Court has recognized that "youth matters in sentencing." *Jones v. Mississippi*, 141 S. Ct. 1307, 1314 (2001).

Although Petitioner's youth at the time of his offenses and length of time in prison do not excuse his conduct, those factors are relevant and weigh in favor of a reduced sentence in this case. *See McCoy*, 981 F.3d at 271 (summarizing district court grants of compassionate release requests where defendants were between 19 and 24 years old at the time of their offenses and had served "substantial sentences . . . [ranging] from 17 to 25 years").

Petitioner's post-sentencing history and characteristics depict a significantly different individual than the one the Court sentenced in 1997. Petitioner has only incurred two minor infractions in his 27 years in prison and none in the last 17 years. Pet'r's Suppl. Mot. at 18. Petitioner has taken advantage of various educational and vocational programs while incarcerated. Mot. Exs. 4–5; Pet'r's Suppl. Mot. at 18–19. Petitioner became certified as a suicide monitor to prevent inmate suicide, designed a mentorship program for young men, and designed a non-profit program to support inmates transitioning out of prison. Mot. Ex. 5. Petitioner earned his GED and has maintained consistent employment in prison, paid taxes on his earnings, and earned commendation from his employers and non-profit partners. Pet'r's Suppl. Mot. at 18 n. 12; Mot. Ex. 6. The character letters submitted to the Court from fellow incarcerated individuals describe Petitioner as a leader within the community and respectful to those around him. Mot. Ex. 6; Pet'r's Suppl. Mot. Ex. 6. The letters of support from his family and faith community also demonstrate Petitioner has maintained strong familial relationships and has a support system outside of prison. Mot. Ex. 6; Pet'r's Suppl. Mot. Ex. 6; Pet'r's Suppl. Mot. at 18–19. The Court also takes note of Petitioner's physical health and underlying conditions, explained in detail above.

Petitioner's post-sentencing conduct "provides the most up-to-date picture of [his] 'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)). The Court finds that Petitioner rehabilitation efforts and support system suggest he

is unlikely to recidivate if released. *See* 18 U.S.C. § 3553(a)(2)(B)–(C). Petitioner would still be subject to five years of supervision if released, which further mitigates any concern of recidivism. *See* J., ECF No. 164. Considering Petitioner's "excellent institutional record[]" and his "substantial steps toward rehabilitation," the Court finds his post-sentencing conduct favors a reduced sentence. *McCoy*, 981 F.3d at 286.

Overall, the 18 U.S.C. § 3553(a) factors favor at least some reduction in sentence, but not a reduction to time served, as Petitioner requests. Considering the gross disparity in Petitioner's sentence caused by § 924(c) stacking, the severity and violence of the offense conduct, the need for general deterrence, Petitioner's age at the time of the offense, his current age and health conditions, his steps toward rehabilitation, and his support system, the Court finds it appropriate to reduce Petitioner's sentence to a total of 600 months.

### IV.   CONCLUSION

For the reasons stated above, Petitioner's Motion to Reduce his Sentence under 18 U.S.C. § 3582(c)(1)(A), ECF No. 489, is **GRANTED**. The Court now imposes a sentence of **SIX HUNDRED MONTHS**. This sentence consists of **FOUR HUNDRED AND EIGHTY (480) MONTHS** on Counts One, Eight, and Nine, to run concurrently; **TWO HUNDRED AND FORTY (240) MONTHS** on Count Seven and Counts Twelve through Nineteen to run concurrently to Count One; **TWO HUNDRED AND FORTY (240) MONTHS** on Counts Ten and Eleven to run concurrently to Count One; **SIXTY (60) MONTHS** on Count Twenty to run consecutively to Count One; and **SIXTY (60) MONTHS** on Count Twenty-One to run consecutively to Count Twenty. All other provisions of Petitioner's sentence **SHALL** remain unchanged.

The Clerk is **DIRECTED** to provide a copy of this Order to the Petitioner, the United

States Attorney, the United States Probation Office, and the Federal Bureau of Prisons.

**IT IS SO ORDERED.**

Newport News, Virginia
June 24, 2024

_____
Raymond A. Jackson
United States District Judge

28